Zerweck Jewelry Company v. Commissioner.
Zerweck Jewelry Co. v. Commissioner
Docket No. 85853.
United States Tax Court
T.C. Memo 1962-85; 1962 Tax Ct. Memo LEXIS 223; 21 T.C.M. (CCH) 439; T.C.M. (RIA) 62085; April 17, 1962
*223 Martin A. Rosenberg, Esq., 1724 Arcade Bldg., St. Louis, Mo., for the petitioner. Claude R. Sanders, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent has determined deficiencies in the income tax of petitioner for the taxable years ended May 31, 1955 and 1956, in the respective amounts of $896.63 and $13,020.65. Due to the concession by petitioner of certain issues raised by the pleadings and the granting of respondent's motion to strike as to other issues raised, the sole remaining issues are (1) whether the proceeds of use and occupancy insurance received by petitioner in its fiscal year ended May 31, 1956, constitute taxable income in the year of receipt and (2) whether the fair market value per share of 13 shares of stock received by petitioner in its fiscal year ended May 31, 1955, in part payment for merchandise stolen from it was $110 as reported by petitioner or $507 as contended by respondent. General Findings of Fact The facts which are stipulated are found as stipulated. Petitioner is an Illinois corporation engaged in the sale of jewelry and appliances with its principal office in East St. Louis, *224 Illinois. Its income tax returns for the taxable years at issue were filed with the district director at Springfield, Illinois. Petitioner kept its books and filed its income tax returns for those years on an accrual method of accounting and on the basis of a fiscal year ending May 31. Herman Strifling, hereinafter referred to as Strifling, is the president-manager of petitioner and owns more than 50 percent of the capital stock of Hart Jewelers, Inc., a corporation which owns 50.5 percent of petitioner's capital stock. Issue 1. Findings of Fact On or about February 7, 1956, a fire occurred in petitioner's place of business which was located at 212 Collinsville Avenue, East St. Louis, Illinois. At the time of the fire, petitioner was insured against loss by business interruption caused by fire under policies of insurance issued by American Central Insurance Company, New York Underwriters Insurance Company, and Newark Insurance Company. The measure of recovery under the policies was as follows: The measure of recovery in the event of loss hereunder shall be the reduction in gross earnings directly resulting from such interruption of business less charges and expenses which *225 do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but not exceeding the ACTUAL LOSS SUSTAINED BY the Insured resulting from such interruption of business. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.
Under the policies "Gross Earnings" were defined as follows: Gross Earnings: For the purposes of this insurance "Gross Earnings" are defined as the sum of: (a)Total net sales, and (b) Other earnings derived from operation of the business, less the cost of: (c) Merchandise sold, including packaging materials therefor, (d) Materials and supplies consumed directly in (services) sold, and (e) (Services) purchased from outsiders (not employees of the *226 Insured) for resale which do not continue under contract. No other costs shall be deducted in determining "Gross Earnings." In determining "Gross Earnings" due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred. On April 19, 1956, petitioner received business interruption insurance proceeds in the aggregate principal amount of $48,271.56 as follows: Policy No.
10213
New York Underwriters In-
surance Company
$18,565.98
789733
Newark Insurance Company
14,852.79
40378
American Central Insurance
Company
14,852.79
Total received
$48,271.56
It is stipulated and we accordingly find that "Acknowledgment of liability and adjustment of petitioner's loss by the insurers were the only events necessary to fix their respective liabilities, and both of these events occurred within the petitioner's taxable year ended May 31, 1956." The insurance proceeds were deposited in petitioner's checking account, were in no way segregated or earmarked on petitioner's books and were used by petitioner without restriction for the ordinary expenses of *227 the operation of its business. Petitioner's business was carried on in temporary quarters for a period of nearly 2 years before its original place of business was available for its reoccupancy. During that period petitioner's ordinary expenses of operation continued. Its occupancy of temporary quarters resulted in a loss of profit during the period of such occupancy. On its Federal income tax return for the taxable year ended May 31, 1956, petitioner reported as income $20,023.77 of the total insurance proceeds. The remainder of the insurance proceeds in the amount of $28,247.79 was reported as income on petitioner's return for the taxable year ended May 31, 1957. In the notice of deficiency respondent determined that the entire amount of the insurance proceeds of $48,271.56 should be reported as taxable income by petitioner in the taxable year ended May 31, 1956. The books and records of the Zerweck Jewelry Company as of the close of the taxable year ended May 31, 1956, reflected computations and statements as follows: Business Interruption Loss
Estimated Sales 2-7-56 to 2-7-57
$300,000.00
Cost of Sales
166,200.00
Estimated Gross Profit
$133,800.00
Estimated Expenses
$ 72,003.74
Loss of sales over an estimated period of 9 months as
agreed upon between petitioner and insurers in settle-
ment of loss
207,000.00
Loss:
$207,000 / X
72,003.74 =
49,682.58
$300,000
Under 50% contribution clause, insurers' liability: Amount of coverage / X loss =
$ 65,000 / X
49,682.58 =
48,271.56
1/2 Est. Gross Profits
$ 66,900
*228 Opinion With respect to this issue the primary controversy appears to be whether petitioner, an accrual basis taxpayer, may report income received by way of proceeds of use and occupancy insurance pro rata over the period of the loss of the use and occupancy of its established place of business. In the alternative, it contends, should we find such proceeds to be reportable entirely in the year of receipt, the proceeds should then be allocated between reimbursement for "continuing costs" or continuing expense of its business operation and reimbursement for loss of profit. In that event it urges the former portion should be permitted to be reported on a pro rata basis over the period of loss of use and occupancy. Petitioner's alternative contention is controlled by , affd. per curiam, (C.A. 3); ; and , wherein it is held that the entire proceeds of use and occupancy insurance where such proceeds, as here, are measured in part by "continuing expenses" constitute ordinary income. Indeed to *229 conclude otherwise here would be to authorize a double deduction of such expenses, for petitioner has in its 1956 return deducted its business expenses, so far as the record shows, in full. Petitioner does not in fact seriously dispute that that part of the proceeds which is measured by lost profit is income. We hold the entire proceeds were such. The primary issue as to when such proceeds are reportable as income is we think clearly determinable without reference to the "claim of right" theory. We are not then at this point concerned with the question of whether the proceeds are income and hence are not concerned with the reason for their receipt. What seems to us to be conclusive of the issue is the fact that income was actually received. Even an accrual basis taxpayer may not report what is clearly income after its receipt. , on appeal (C.A. 2, December 10, 1959); ; ; and . Here we have an actual receipt of cash in pursuance of the *230 terms of a contract of insurance. Settlement has been made of the insurer's liability under the contract and the petitioner has acknowledged the settlement and released the insurer from the liability arising from the fire. The contract is complete and nothing further need be done by petitioner to earn the income. All of the above facts occurred in petitioner's fiscal year ended May 31, 1956. Nothing said by the Supreme Court in the prevailing or the dissenting opinions filed in , affirming , rehearing denied , is controlling of or has direct bearing upon the issue here presented. There the issue was whether, under a method of accounting allegedly designed to properly reflect income, prepaid receipts by the taxpayer which were payment for services to be rendered in the future constituted income on receipt or became income ratably as the services were rendered. There the claim was made that although the prepaid receipts were without restriction in the hands of the taxpayer, they still did not constitute income by way of compensation for services until and *231 as such services were rendered. Here it is stipulated that all factors existed which fixed the liability of the insurer to make payment to petitioner in the year of the receipt thereof. In , the issue before the Court was whether receipts were income while here the issue is when what is income is to be reported as such. We hold for respondent on this issue. Issue 2. Findings of Fact During the taxable year ended May 31, 1955, petitioner received from William Davey, a former employee, 13 shares of petitioner's issued stock in part payment for merchandise theretofore stolen from petitioner by Davey. At the time of the receipt of the stock Davey was in addition indebted to petitioner on open account in the amount of $1,473.48. Upon its receipt of the stock, petitioner, on its books, treated Davey's open account as paid in full and retired the stock. Petitioner placed a fair market value of $1,473.48 on the 13 shares of stock and included that amount in taxable income in its Federal income tax return for the taxable year ended May 31, 1955. In the notice of deficiency respondent determined the fair market value *232 of the 13 shares of stock to be $6,591 ( $507 per share) and included the amount of $5,117.52 in petitioner's taxable income for the taxable year ended May 31, 1955, as a result of this adjustment. On November 14, 1952, Hart Jewelers, Inc., which is controlled by Strifling, purchased 177 shares of petitioner's stock at a price of $507 per share. Strifling represented Hart Jewelers, Inc., in this purchase of petitioner's stock and, after investigation of petitioner's financial condition, concluded that $507 per share was a fair price for its stock. Strifling was not related to the persons who sold petitioner's stock to Hart. On or about November 14, 1952, Strifling, on behalf of petitioner, agreed to purchase shares of petitioner's stock for $507 per share from certain of petitioner's employees. The agreement applied to Davey. At the time the agreement was executed, Strifling believed that the fair market value of petitioner's stock was $507 per share. On December 10, 1952, petitioner's employee Stoehr sold 28 shares of petitioner's stock to one Weinberg at $507 per share. Stoehr and Weinberg were not related. During the year ended May 31, 1954, Weinberg sold the aforesaid 28 shares *233 of stock to petitioner for $507 per share. Weinberg was Strifling's brother-in-law. On December 10, 1952, petitioner's employee Gehrhardt sold 107 shares of petitioner's stock to petitioner for $507 per share. During the year ended May 31, 1956, petitioner's employee Stoehr sold 25 shares of petitioner's stock to petitioner for $507 per share. As of May 31, 1955, the book value of petitioner's stock was $1,008.20 per share. Ultimate Finding of Fact The fair market value of the 13 shares of petitioner's stock transferred to it by Davey during the year ended May 31, 1955, was $507 per share on the date of its transfer. Opinion The parties have stipulated and we have accordingly found as fact that the 13 shares of stock of petitioner transferred to it by Davey were in part payment for merchandise therefore stolen from petitioner by him. We think the proofs also justify a conclusion that the stock was also transferred to retire Davey's open account indebtedness to petitioner in the amount of $1,473.48. In the face of the above stipulation petitioner contends the stock had a fair market value even slightly less than $1,473.48. On the other hand, respondent has valued the *234 stock at $507 per share and has increased petitioner's reported income by the difference of $5,117.52. Respondent bases his valuation upon the purchase price paid for like stock in a sale to Hart Jewelers, Inc., and four sales to petitioner, beginning with Hart's purchase of 177 shares November 14, 1952, the fifth sale to petitioner occurring after the valuation year at issue on May 31, 1956. On each occasion Hart and petitioner paid $507 per share regardless of whether the block of stock was large or small. Each sale subsequent to the first to Hart was made after Hart had acquired a controlling stock interest. We note also that Strifling, the agent and controlling stockholder of Hart, had for many years, as a salesman, dealt with petitioner, and we think he was well aware of the value of its stock when, as agent for petitioner, he agreed on or about November 14, 1952, to purchase at any time petitioner's stock held in small blocks by certain of its employees at $507 per share. It is clear to us that all five sales transactions were at arm's length and are indicative of the fair market value of the 13 shares transferred to petitioner by Davey during the year ended May 31, 1955. ; *235 ; and . Petitioner's proof of fair market value of the involved stock was the testimony of its accountant who was a C.P.A. who fixed the fair market value of the stock at $110 per share in preparing petitioner's 1955 income tax return. As against the abovenoted evidence of repeated sales of like stock at $507, we cannot credit his testimony with great weight for the record is virtually silent with respect to his qualification to place an unbiased fair market valuation on the unlisted stock of a closely held corporation such as petitioner. Our findings are dispositive of this issue. Decision will be entered for the respondent.